### PEOPLES SAVINGS BANK v. STODDARD.

1. EQUITY—MOTION TO DISMISS—PLEADING.

   The Supreme Court must treat the charges made in a bill of complaint as true when determining the propriety of an order made upon motion to dismiss before hearing.

2. BANKS AND BANKING—MONOPOLIES—HEARING—JURISDICTION.

   Decree granting motion to dismiss bill by State bank against a national bank, its affiliate and officers common to both to enjoin defendants from monopolizing or attempting to monopolize the banking business in a specified area, serviced by plaintiff and a branch of defendant, and from directly or indirectly controlling or exercising dominion of ownership over the capital stock of plaintiff's bank is reversed in order to afford an opportunity for hearing on the merits and better enable trial court to ascertain whether or not it has jurisdiction to hear and determine the cause.

   DETHMERS, C. J., and CARR and KELLY, JJ., dissenting.

Appeal from St. Clair; Hartrick (George B.), J., presiding. Submitted October 15, 1957. (Docket No. 55, Calendar No. 47,282.) Decided March 5, 1958.

Bill by Peoples Savings Bank, a Michigan banking corporation, against Howard J. Stoddard, Michigan National Bank, a national banking corporation, its affiliate Michigan National Bank Employees' Profit

---

REFERENCES FOR POINTS IN HEADNOTES
[2] 3 Am Jur, Appeal and Error § 1134.

Sharing Trust, and various bank and trust officers to restrain defendants from monopolizing banking business in Port Huron by exercise of control of plaintiff bank's stock.   Thomas M. Kavanagh, attorney general, intervened as party plaintiff.   On motion of defendants, decree entered dismissing bill and cause. Plaintiff and intervening plaintiff appeal.   Reversed and remanded.

*McClintock, Fulton, Donovan & Waterman* and *Covington, Davidson & Osborn,* for plaintiff.

*Thomas M. Kavanagh,* Attorney General, *Samuel J. Torina,* Solicitor General, *Maurice M. Moule* and *James R. Ramsey,* Assistants Attorney General, for intervening plaintiff.

*Walsh, O'Sullivan, Stommel & Sharp* and *Butzel, Eaman, Long, Gust & Kennedy,* for defendants.

KELLY, J. (*dissenting*).   Plaintiff filed a bill of complaint in chancery in the circuit court for the county of St. Clair, seeking an injunction against defendants from monopolizing or attempting to monopolize the banking business in the Port Huron-Marysville area by directly or indirectly controlling or exercising dominion of ownership over the capital stock of plaintiff's bank.   Plaintiff appeals from Hon. George B. Hartrick's decree of April 2, 1957, which provides:

"This cause coming on to be heard on the bill of complaint as amended and supplemented and upon the intervention of the attorney general and the motion to dismiss as amended and supplemented and the showing in support thereof and the court having heard arguments of counsel and received briefs with respect thereto and being fully advised in the premises;

"Now, therefore, it is hereby ordered, adjudged and decreed:

"1. That the bill of complaint as amended and supplemented and the said cause may be and is hereby dismissed."

In determining whether the court erred in dismissing the bill of complaint, we shall accept the following facts pleaded by plaintiff as true:

(1) Plaintiff is a banking corporation duly organized and existing under the banking laws of the State of Michigan,* having its principal office and 1 branch office in the city of Port Huron, St. Clair county, Michigan, and 1 branch office in the city of Marysville, St. Clair county, Michigan.

(2) Defendant Michigan National Bank is a national banking association organized and existing under the banking laws of the United States, having its principal office in the city of Lansing, Ingham county, Michigan.

(3) At or about June, 1940, the First National Bank of Port Huron was consolidated into defendant Michigan National Bank and became the latter's Port Huron branch. Plaintiff and the Port Huron branch of defendant Michigan National Bank comprise the only banking institutions in the Port Huron-Marysville area.

(4) In or about May, 1956, Myron E. Ogden, the then president of plaintiff bank and the owner of 51% of the capital stock of said bank, offered his stock for sale.

(5) Defendant bank was barred from purchasing Ogden's stock by provisions of the national banking act† and the Michigan financial institutions act,* and

---

* CL 1948 and CLS 1956, § 487.1 *et seq.* (Stat Ann 1957 Rev § 23.711 *et seq.*).

† 12 USC, § 21 *et seq.*

being so barred,* defendant bank, through its officers, directors and members of its executive committee, turned to an agency of defendant bank, namely, the Michigan National Bank Employees' Profit Sharing Trust (as officers of the Michigan National Bank such officers were also *ex officio* trustees of said Michigan National Bank Employees' Profit Sharing Trust) and entered into a plan whereby defendant Leonard O. Zick was provided "with moneys in excess of $600,000 with which to permit defendant Leonard O. Zick to purchase in his own name but secretly in behalf of defendant Trust and indirectly in behalf of defendant Michigan National Bank the 51% block of plaintiff's stock offered for sale by said Myron E. Ogden, and to pay defendant Leonard O. Zick a fee for so acting as agent for them as undisclosed principals and for acquiring in his name but in their behalf additional capital stock of plaintiff up to a total of 66–2/3% of the total stock outstanding."

(6) That pursuant to said agreement, combination and conspiracy between defendants and Zick, Zick purchased on July 20, 1956, 10,439 shares of plaintiff's outstanding capital stock from the owner Myron E. Ogden, said 10,439 shares being a major part of the 20,000 shares outstanding and that Zick in purchasing Ogden's stock used the money that was secretly furnished to him by defendants.

(7) That after acquiring the Ogden stock Zick publicly stated that it was his intention to become a bona fide resident of Port Huron and assume active management of plaintiff's business and affairs, and because of said statement plaintiff's board of directors at their meeting July 24, 1956, accepted Myron E. Ogden's resignation as president and director and

---

* See, specifically, 12 USCA, § 24, and CL 1948, § 487.33 (Stat Ann 1957 Rev § 23.761). See, also, as to branches, 12 USCA, § 36, and CL 1948, § 487.34 (Stat Ann 1957 Rev § 23.762).—Reporter.

elected Leonard O. Zick as director and president of said bank.

(8) For a period of 7 weeks subsequent to his election as a director and president of plaintiff and pursuant to the scheme, plan, arrangement, combination and conspiracy that he had entered into with defendants, Leonard O. Zick pretended to assume the duties as president of plaintiff by attending the office provided for him, by taking a part in certain management decisions and by attending 1 meeting of its board of directors. During all of said period however, defendant was in fact using the office of president and director to fulfill the terms of his secret agreement with defendant conspirators to acquire enough additional shares of plaintiff's capital stock to bring the holdings registered in his name (but for the benefit of defendant Michigan National Bank) to 66-2/3% of the total outstanding stock.

(9) Zick, in his capacity as president of plaintiff bank, called a meeting of its board of directors for September 25, 1956. When this meeting was called to order Zick was not present, but Howard J. Stoddard, president of defendant Michigan National Bank, was present, as was also Frank J. McCabe, a member of said defendant bank's executive committee. At said meeting Stoddard made known that the individual defendants, other than defendant Zick, in their capacity as trustees of defendant Michigan National Bank Employees' Profit Sharing Trust, held certificates representing 66-2/3% of plaintiff's capital stock which had been acquired for them as undisclosed principals by their agent Zick. Stoddard and McCabe also made known at said meeting the intention of said defendants to cause plaintiff to be liquidated, its bank offices closed, and the assets and liabilities taken over by the Michigan National Bank. This intention of taking over plaintiff bank was made

known by a public statement published in the Port Huron newspaper on September 30, 1956.

(10) Since September 19, 1956, Zick has not appeared at plaintiff's office, nor has he been in communication with any of plaintiff's officers or directors. On September 28, 1956, plaintiff fired Zick as its president and director for failure to own qualifying shares of plaintiff's capital stock, as required by law.

(11) As of the date of filing the bill of complaint herein certificates representing 13,141 shares of plaintiff's capital stock were registered on its books in the name of Leonard O. Zick and plaintiff has been informed by defendant Stoddard that sufficient additional shares have been acquired by him as agent and assigned to other coconspirators to total 66-2/3% of plaintiff's outstanding capital stock; that on December 5, 1956, defendant Michigan National Bank Employees' Profit Sharing Trust presented to plaintiff certificate 2739 in the name of defendant Leonard O. Zick for 10,439 shares, dated July 20, 1956, together with an assignment by defendant Zick, of the same date, to defendant Trust, and requested new certificate to said assignee; that although certificates for the remainder of said 2/3 of the stock have not been presented to plaintiff for transfer to said coconspirators, or their nominees, the plaintiff fears and is informed and believes that said coconspirators have possession of said certificates and that they will in the immediate future, unless enjoined by the order of the court, present the same for transfer and will thereupon vote to cause the liquidation of plaintiff, or to elect themselves or representatives as directors and operate plaintiff for their own purpose and thus accomplish the end results of the scheme, plan, agreement, combination and conspiracy heretofore described—namely, to close down all of plaintiff's bank offices or to control plaintiff's operations

and thereby eliminate competition in the business of banking between plaintiff and defendant Michigan National Bank in the Port Huron-Marysville area, and to create for defendant a perfect and complete monopoly therein, or to operate plaintiff as an additional branch or branches of defendant bank in violation of the Michigan financial institutions act.

Plaintiff concludes its second amended bill of complaint, before its prayer for relief, with the following statements:

"27. This action is based upon the common law of the State of Michigan by virtue of the fact that the acts described in the foregoing paragraphs constitute a violation of the said common law of the State of Michigan to the extent that the defendants conspired to monopolize the business of banking in the Port Huron-Marysville area and to combine in restraint of trade in said area; if defendants are permitted to achieve their conspiratorial goal, a monopoly of said business and combination in restraint of trade will result and, consequently, will further constitute a violation of the common law of the State of Michigan.

"28. This action is based upon, and the acts described in the foregoing paragraphs constitute violations of PA 1899, No 255, as amended, PA 1905, No 329, as amended, and PA 1937, No 341, § 34, as amended.*

"29. As a result of the acts of the defendants described in the foregoing paragraphs, plaintiff has suffered damages in excess of $1,000,000 and will, in the future, continue to suffer damages.

"30. Plaintiff has no adequate remedy at law, but must resort to this court of equity to obtain the relief to which it is entitled by virtue of the common law of the State of Michigan and by virtue of the statutory enactments cited in paragraph 28 hereof.

* CL 1948, § 445.701 *et seq.* (Stat Ann § 28.31 *et seq.*); CL 1948, § 445.761 *et seq.* (Stat Ann § 28.61 *et seq.*); CL 1948, § 487.34 (Stat Ann 1957 Rev § 23.762).—REPORTER.

The amount in controversy exceeds the sum of $1,000."

Previous to entering the decree of dismissal (April 2, 1957) Judge Hartrick issued a written opinion (March 13, 1957), and in said opinion stated:

"The problem for solution is whether or not there is a legal wrong and if so, has the court the power to suppress and find solution. The defendants challenge the court's jurisdiction.

"If the defendants' effort is a subtle maneuver to accomplish indirectly what cannot be accomplished directly, that is, to acquire a branch bank at a prohibited distance from the parent bank for operation or destruction contrary to the State banking statute, CL 1948, § 487.34 (Stat Ann 1957 Rev § 23.762), and the United States law imposing the same restrictions upon national banks, 12 USCA, § 36, our Supreme Court has held the issue one of Federal jurisdiction. *Attorney General, ex rel. State Banking Commissioner,* v. *National Bank of Detroit,* 338 Mich 610.

"The Federal court for the Eastern District of Michigan recently restrained the First National Bank of Detroit, even after completing its banking facilities, from operating a branch bank in the city of Troy, holding the Wayne-Oakland Bank, a State banking institution, held priority in the area. The attack upon branch banking was quite properly taken in the Federal court.

"The shareholders who sold their stock in the plaintiff bank do not complain of sharp practice or fraud having been perpetrated upon them in the purchase. No grievance between the sellers and buyers of the shares is in issue.

"The shareholders who own 2/3 of the stock of a bank may vote its liquidation under CL 1948, § 487.99 (Stat Ann 1957 Rev § 23.852). This is a statutory contingency, be it a peril or otherwise, it is one to which the individual stockholders must be subservient.

"The right of the Michigan National Bank Employees' Profit Sharing Trust to purchase and legally hold the stock may be subject to examination. It is seemingly without the pale of challenge in the State courts, the trust was organized pursuant to the Federal statutes and is an affiliate of the Michigan National Bank, equally so amenable.

"A provision of the Michigan financial institutions act in contravention of such holding would be inapplicable to a national bank unless so prescribed by United States law. There is no apparent prescribed State statutory limitation preventing a shareholder in a State bank from selling his stock to such a trust. A limitation of purchase by the trust if existent is within the scope of Federal law and one of Federal jurisdiction.

"In absence of a complaint by a beneficiary under the trust, the plaintiff is in no position to claim maladministration or violation of the terms of the trust by the trustees of the Michigan National Bank Employees' Profit Sharing Trust.  *  *  *

"The activities of a national bank touches a field in which the Federal interest predominates. Essential Federal regulation covering the subject matter seemingly precludes the enforcement of State laws similarly objective.

"If the banking facilities in the city of Port Huron are inadequate through or after the liquidation of the plaintiff bank, a remedy may be found in an application to the State banking commissioner for such additional facilities and for the organization of a new State bank. See *Moran* v. *State Banking Commissioner,* 322 Mich 230.

"The plaintiff banking corporation as an entity in itself is in no position to complain. The intent of the court is to construe applicable laws, not to give approval of factual methods. The court finds no legal or State statutory assistance available to the plaintiff. It is possible Federal jurisdiction may be invoked.

"The injunction heretofore issued may be dissolved and an order entered dismissing the cause. The order may provide for a stay of proceedings pursuant to Court Rule No 62 (1945) to permit the plaintiff to appeal or take such other action as may be deemed appropriate."

Defendants' second supplemental motion to dismiss, supported by affidavit, challenged the jurisdiction of the State courts, and stated:

"Defendant Michigan National Bank is organized under the national banking laws of the United States and as such is an agency of the United States and at its office in Port Huron and offices elsewhere is engaged in conducting interstate banking transactions and business as an instrumentality thereof and as such agency and instrumentality if banking business so conducted is subject to any law relating to monopolies and restraint of trade it is subject to the laws of the United States known as the Sherman anti-trust act (Act of July 2, 1890, ch 647, 26 Stat 209, as amended [15 USCA, §§ 1–8]) and of the Clayton anti-trust act (Act of October 15, 1914, ch 323, 38 Stat 730, as amended [15 USCA, §§ 12–27, 44, 29 USCA, § 52]), and thereby any application to said bank of the laws, statutory or common, of the State of Michigan in relation to the subject of said cited laws of the United States is excluded.

"Defendant Michigan National Bank is organized and exists under Title 12 of the United States Code and as such bank is an agency of the United States. By  *  *  *  (12 USC, §§ 221, 221a), Michigan National Bank is authorized to have an affiliate which may be 'any corporation, business trust, association or other similar organization.' Likewise, under section 401 of the IRC of 1954 (26 USC, § 401), formerly section 165(a) of the IRC of 1939, a 'trust  *  *  * forming part of a  *  *  *  profit-sharing plan' is specifically authorized. Defendant Michigan National Bank Profit Sharing Trust was created as such trust under said section, the said Trust, of which a

copy is attached to the supplementary statement of the attorney general herein, is such trust. Paragraph 10 of said trust specifically authorizes use of the fund thereof 'to purchase stock of the Michigan National Bank or other Michigan banks or Michigan insurance companies.' The said trust is an affiliate of said Michigan National Bank under subsection (b) (3) of said section 221a, and other provisions of said section and is a 'holding company affiliate' under subsection (c) of said section 221a, inasmuch as said trust 'controls    *    *    *    the election of a majority of the directors of any one bank.' The word bank is defined by said section 221 as follows:

" 'Wherever the word "bank" is used in this chapter, the word shall be held to include State bank, banking association, and trust company, except where national banks or Federal reserve banks are specifically referred to.' "

Plaintiff claims the court erred in considering the allegations above referred to and finding that defendant Michigan National Bank Employees' Profit Sharing Trust was organized pursuant to Federal statutes as an affiliate of defendant Michigan National Bank and that defendant Michigan National Bank is engaged in interstate commerce.

Court Rule No 18, § 1 (1945), provides:

"Defendant may    *    *    *    file a motion to dismiss the action or suit, where any of the following defects appear on the face of the    *    *    *    bill of complaint, and he may, within the same time, file a similar motion supported by affidavits where any of the said following defects do not appear upon the face of the    *    *    *    bill of complaint:    *    *    *

"(b) That the court has not jurisdiction of the subject matter of the action or suit."

Plaintiff did not deny or traverse the allegations of defendants. Plaintiff's first amended bill of complaint charged that defendants violated the Sherman and Clayton acts.

We believe that the chancellor did not err in considering the question of jurisdiction, the undenied facts shown by the affidavit in support of the motion to dismiss.

The shareholders who sold their stock in the plaintiff bank do not complain of fraud. No grievance between the sellers and buyers of the shares is in issue. The shareholders who own 2/3 of the stock of a bank may vote its liquidation under CL 1948, § 487.99 (Stat Ann 1957 Rev § 23.852).

Appellant, intervening attorney general, admits the maladministration of the trust funds is not at issue in this case, and states:

"The plaintiff does not challenge the right of Michigan National Bank under the national bank act to have an affiliate nor question what kind of an organization will qualify as an affiliate under the national bank act. Plaintiff does challenge the right of Michigan National Bank, even assuming its right to have an affiliate and its right to have a profit-sharing trust such as that here involved as an affiliate, to employ that affiliate in a manner which will constitute a violation of the State anti-monopoly law."

Two Michigan anti-monopoly statutes, PA 1899, No 255 (CL 1948, § 445.701 *et seq.* [Stat Ann § 28.31 *et seq.*]) and PA 1905, No 329 (CL 1948, § 445.761 *et seq.* [Stat Ann § 28.61 *et seq.*]) have been a part of our Michigan law for more than 50 years. In these 50 years these statutes have not been invoked or used in regard to banking operations. Our economic philosophy has been based on the theory that free competition, even though resulting in casualties, is for the public benefit, but this philosophy has not extended into banking operations, because a bank's failure has been considered by our people as a community disaster. Citizens, however morally and financially worthy, cannot engage

in banking without the approval of the banking commissioner.

The attorney general, in 1955, was requested by the State banking department to pass judgment on the regularity of a consolidation of banks in the cities of Birmingham and Ferndale, where, in each city, 2 competing banks were taken over and replaced by 1 branch of a Detroit bank, which resulted in only 1 bank in each city. The attorney general's opinion (Opinions of Attorney General, 1955–1956, No 2304, pp 541, 544), authorized the consolidation and in his opinion the attorney general stated:

"Though bank A could not, by consolidation or otherwise, establish a branch in city X if other competitor banking facilities are present, if all competitor banking facilities are removed from city X through consolidation with bank A, bank A could establish a branch or branches in city X within the meaning of section 34 of the act."[*]

Numerous United States supreme court decisions declare that State and local laws yield to Federal statutes when Congress acts to pre-empt the field of regulation. In *Albertson* v. *Attorney General,* 345 Mich 519, this Court held that the Michigan statute known as the Trucks act (PA 1952, No 117, as amended) was unconstitutional.[†] This statute defined "communist," "communist party," and "communist-front organization," and required the attorney general to prepare and publish a list of such organizations and required members to register with the State police and the party officers to register the party or organization, giving details as to its officers, funds, meeting places, names of members, and barring the use of election machinery. We there said (p 527):

---

[*] CL 1948, § 487.34 (Stat Ann 1957 Rev § 23.762).—REPORTER.

[†] CLS 1956, § 752.321 *et seq.* (Stat Ann 1955 Cum Supp § 28.243 [11] *et seq.*).—REPORTER.

"The congress of the United States has occupied the field entered by the Trucks act to the extent that the Federal acts supersede the enforceability by the State of the provisions of said act,"

and quoted (p 525) with approval *Pennsylvania* v. *Nelson,* 350 US 497, 504 (76 S Ct 477, 100 L ed 640), as follows:

" 'We examine these acts only to determine the congressional plan.   Looking to all of them in the aggregate, the conclusion is inescapable that congress has intended to occupy the field of sedition. Taken as a whole, they evince a congressional plan which makes it reasonable to determine that no room has been left for the States to supplement it.   Therefore, a State sedition statute is superseded regardless of whether it purports to supplement the Federal law.   *   *   *

" 'The Federal statutes, "touch a field in which the Federal interest is so dominant that the Federal system [must] be assumed to preclude enforcement of State laws on the same subject." ' "

The Sherman act was enacted by Congress in 1890.   Michigan's first anti-monopoly law, relied upon by plaintiff, was enacted in 1899.   Our State statute did not supplement the Federal enactment and was not created to give to our State courts jurisdiction over national banks engaged in interstate commerce.

In the enactment of the Sherman act, congress exercised its full power over interstate commerce; in reference to commercial trade, congress, in passing the Sherman act, left no area of its constitutional power unoccupied; the Sherman act was designed by congress to go to the utmost in its constitutional power to restrain trust and monopoly agreements and the supplemental Clayton act was intended to

have the same all-inclusive scope. See *Transamerica Corporation* v. *Board of Governors of Federal Reserve System* (CCA), 206 F2d 163; *Las Vegas Merchant Plumbers Ass'n* v. *United States* (CCA), 210 F2d 732; *United States* v. *Frankfort Distilleries, Inc.*, 324 US 293 (65 S Ct 661, 89 L ed 951).

In *Attorney General, ex rel. State Banking Commissioner*, v. *National Bank of Detroit*, 338 Mich 610, this Court held: (1) That a Federally-created agency is subject to State law and enforcement of same in the State courts when there is no Federal law governing the subject, and the State act in nowise conflicts with paramount Federal law or with the purposes for which the Federally-created agency was established; (2) That the national bank act, in providing for and governing the establishment of branches by national banks and fixing the standard, by which it must be determined as to whether State law permits it to be done by State banks, sets up a standard for the violation of which would be a Federal offense; and (3) That the State Supreme Court is without jurisdiction to enforce a Federal law against a Federally-created corporation even though the Federal law employs State law as a measuring stick for its application—hence, such court may not prevent a national bank from establishing a branch in a city in which a State bank is already in operation although such action by a State bank is barred by State statute.

We agree with the chancellor's decision that if a legal wrong has been committed, it was committed by the defendant Michigan National Bank, a national banking association, and its activities touch "a field in which the Federal interest predominates. Essential Federal regulation covering the subject matter

seemingly precludes the enforcement of State laws similarly objective."

The decree of the lower court should be affirmed. Costs to appellees.

DETHMERS, C. J., and CARR, J., concurred with KELLY, J.

VOELKER, J. We must respectfully disagree with the result reached by our Brother in this case. Whether, after hearing, the trial court may ultimately determine that it has or lacks jurisdiction to hear and determine the cause, we do not think that this and other important questions should be decided upon a motion to dismiss supported by a conclusionary affidavit of the interested parties. The charges made in the bill of complaint here are grave. If true (and at this time we must treat them as true) they strike deep at the heart of the right of a State to protect itself and its citizens from monopolistic practices which its legislature has declared harmful. We do not think that what could in effect amount to a determination of legal untouchability in a case of such public gravity and proportions should be so decided. We also believe that the possible application of the many cases cited pro and con bearing on the complex issues presented here can best be determined upon a full record. Nor are we convinced at this time that the operations of the defendant bank which may be largely interstate in their nature necessarily foreclose in advance the important question whether some of its actions may not in a proper case nevertheless be treated as intrastate. At least whether or not these and other things may be so in our opinion can scarcely be effectively decided in advance of full evidentiary proofs. We think and hold that the decree below should be reversed and set aside and the

cause remanded to proceed to issue and hearing on the merits.

SMITH, BLACK, and EDWARDS, JJ., concurred with VOELKER, J.

KAVANAGH, J., took no part in the decision of this case.